FILED & ENTERED

MAR 26 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY penning   DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 2:08-bk-12652-TD |
| Uriel Arellano Castro,<br>Norma Alicia Arellano, | Adversary No. 2:08-ap-01511-TD |
| | Chapter 7 |
| | MEMORANDUM DECISION |
| Debtors, | |
| Rosalina Trinidad, Luis Ramos, | |
| Plaintiffs, | |
| vs. | |
| Norma Alicia Arellano, Uriel Arellano Castro, | |
| Defendants. | |

## INTRODUCTION

This memorandum is issued in response to a Motion for Default Judgment (Motion) filed

by Plaintiffs Rosalina Trinidad (Rosalina) and Luis Ramos (Ramos) on their First Amended

Complaint (Complaint) seeking denial of discharge and determination of some $1.7 million of

alleged indebtedness and nondischargeability against Defendants Uriel Arellano Castro (Uriel) and Norma Alicia Arellano (Norma), joint debtors, in their 2008 chapter 7 bankruptcy case.[1]

Defendants appeared through counsel who withdrew from the litigation without a motion or court order in early 2009 after Defendants' Motion to Dismiss was denied and mediation efforts failed to produce a resolution. Defendants continued to attend hearings without counsel, failed to respond to the Complaint, and announced orally at a status conference hearing that they elected to let the lawsuit proceed by default. I announced at a hearing on August 5, 2009, that I found it necessary to hear live testimony in support of Plaintiffs' claims, subject to my questioning of witnesses. In response, Plaintiffs' counsel, Scott G. McMillan, The McMillan Law Firm, APC, urged a different, written approach without live testimony or witnesses. McMillan urged this approach for the reasons that the evidence would require the testimony of native Spanish speakers, through translators, and that some witnesses were residing in Mexico, thereby posing expense and other practical problems for Plaintiffs. Thus, McMillan requested the opportunity to present Plaintiffs' evidence in writing. I granted that request on the express understanding that such would be Plaintiffs' one opportunity to present their evidence, win or lose, as discussed at hearings on August 5 and October 14, 2009. My final scheduling order was entered November 4, 2009. Based on my review of the written record, I have concluded that a further hearing is unnecessary.

The following are my findings of fact and conclusions of law and my decision based on the pleadings, evidence and briefing submitted by the Plaintiffs by way of their Complaint and their Motion, and on the record in the Defendants' chapter 7 bankruptcy case and this adversary proceeding.

---

[1] I refer to three of the parties by their first names and one by his last name because that is most consistent with the record.

# OVERVIEW

Plaintiffs' allege that in April 2003, Norma, Rosalina and Rudolfo Rodriguez met for the purpose of starting a new company through which they would sell nutritional supplements employing a so-called "multi-level marketing plan." Rosalina, Ramos and Norma started working in mid-2003 on an enterprise called "Oxcell," based on each person's more or less unilateral concept of how the enterprise was to function. The record is clear, as will be discussed later, that neither Rodriguez nor Rosalina made any cash capital contributions to Oxcell though Rosalina specifically promised to do so. There is no other basis in the evidence for determining that Rosalina owned any equity position in the enterprise or, with respect to most of her claims, for Rosalina to assert claims against the Defendants in this lawsuit. Expenses were incurred and paid for during a startup period along with salaries, but all collective efforts of the parties came to an end in early 2004 when Rosalina declined to participate any further and turned her attention to a new, independent enterprise. Plaintiffs filed a state court complaint against Defendants in 2005. As of 2008, as far as I can discern from the record on Plaintiffs' Motion, no resolution of the state court lawsuit was reached by the time Defendants filed their chapter 7 petition or since. Plaintiff's discovery record in the state court lawsuit and in this adversary provides little clarity.

Stated simply, Plaintiffs make the following allegations in their Complaint. There was an oral agreement to establish Oxcell, Inc., between Norma, Rosalina and Rodolfo Rodriguez. It was to be a three-way deal, 1/3 each initially, later 50/50, when Rodriguez declined to contribute or participate and quickly dropped out. Plaintiffs claim that Defendants took unfair advantage of them in the enterprise. The evidence shows that startup corporate steps were taken, but there were no allegations of any formal corporate meetings or minutes; no stock was issued; there were no written or oral employment policies or agreements. There were no

allegations of any agreement as to how corporate earnings were to be calculated, determined or paid, either before or after Rosalina left the Oxcell enterprise.  No evidence was introduced that would support a reasonable, objectively determined resolution of such issues.  There was evidence of some investment and sales activity, but there was no plausible, non-conclusory, credible evidence that any profit was realized.  Plaintiffs' evidence consisted of sales of, or investment in, "business centers" (whatever that means; Plaintiffs' evidence does not adequately explain the meaning), and such sales or investments were accompanied by delivery of product with each purchase or investment.

The evidence makes it clear that Norma agreed to produce all records requested. Though there were bank accounts, no bank statements were included in Plaintiffs' evidence. Only vague allegations and self-serving, conclusory evidence was introduced in support of Plaintiffs' claims for reimbursement of expenses.  The evidence revealed other Oxcell activities, such as the leasing of an office, travel, bank accounts, work on software and computers, conversation, all without any convincing or plausible evidence of any enforceable unmet promise or agreement in favor of Plaintiffs.  The evidence did not prove the existence of mutual consent to any agreement supportive of Plaintiffs' claims.

The only basis for decision or judgment lies in (1) the Complaint, (2) Defendants' defaults entered in 2009, and (3) Plaintiffs' Motion, which is in improper and unacceptable form, poorly organized and unmarked, containing evidence that is largely conclusory, vague and uncertain.  The deposition transcripts furnished to chambers are unmarked and consist of hundreds of pages accompanied primarily by conclusory declarations asserting what the "evidence" shows, not necessarily supported by the testimony, all of which is uncorroborated and unpersuasive.

### THE EVIDENCE

Rosalina Trinidad's October 29, 2009 declaration recites a conclusory, unpersuasive history, the bottom line of which is that she and her co-plaintiff Luis Ramos worked for several months from mid-2003 up through early 2004.  Rosalina's deposition testimony is clear that she was paid a salary and allowances for various expenses while she worked for Oxcell. (Rosalina's Depo. 119:16–121:24 and Exhibit D)  The record reflects that Rosalina was paid a weekly salary of $300 and weekly automobile, meal, entertainment and cell phone allowances totaling $250 from September 12, 2003 through November 14, 2003, and, apparently, through April 23, 2004, an additional $3,600 in salary and $3,000 in expense allowances.  (Id.)  When asked whether there was any mistake in the amount paid to her as reflected in the Oxcell documentary evidence, she answered "No."  (Id. at 121:2-17)  At that point, according to the evidence, she and Ramos left Oxcell to begin working through "Elixery," a new enterprise she established to sell nutritional supplements with Ramos independently of Oxcell.

Rosalina says there were "Oxcell sales" during this 2003-2004 period and that she never got an accounting from Norma, but Rosalina offers only vague, unpersuasive, conclusory and uncorroborated statements in support.  Rosalina testified in vague, conclusory, unpersuasive fashion, such as, "it was revealed" and "I am informed and believe" that Oxcell had profits of $262,150 as of February 2004, and she claims she should be entitled to half, $131,075.  (Rosalina's Declaration, October 29, 2009, 10:2-8)  While there was revenue, there is no evidence that any profit was realized in Oxcell, ever.  On the other hand, the deposition evidence shows that prior to the departure of Rosalina and Ramos, Norma advanced Oxcell expenses totaling about $91,000 up through early 2004 through the use of her personal credit

cards.  (Norma's Depo. 90:18–97:16; 7:27–8:1; 223:19-25; 251:15-19)[2]  Norma's state court

deposition testimony establishes that Rosalina had promised at Oxcell's startup in 2003 to sell

property she owned in Tecate, Mexico, to pay her share of Oxcell expenses but that Rosalina

never did so.  (Norma's Depo. 221:11-16; 127:19–128:4; 222:16–224:6; 233:23–234:19)

Instead, Rosalina abandoned Oxcell and began conducting a new business, "Elixery," with

Ramos.  Thus, the evidence demonstrates that any pretense of a partnership or mutual

corporate enterprise between Norma and Rosalina was terminated by Rosalina's unilateral

conduct in early 2004.  Though Rosalina disputed the adequacy of the records, she

acknowledged that Norma gave her copies of Norma's "accounting documents" to Rosalina in

February 2004. (Rosalina's Depo. 44:4-16)

The evidence concerning Oxcell operations during the 2003-2004 period established

that there was a lease, equipment, utilities, purchases of product, delivery of product to

investors and other expenses.  The evidence does not establish the existence of any profit by

the early part of 2004, or otherwise, over and above the Oxcell expenses that Norma paid with

her personal credit cards.  During this period, both Norma and Rosalina received

compensation for their services and reimbursement for some business expenses.

A transcript of Rosalina's deposition from the state court lawsuit is offered.  Norma and

Uriel were not represented at Rosalina's deposition.  Thus, it may not be appropriate to allow

such testimony as evidence against Defendants.  Further, no copies of exhibits to any

deposition transcript were filed as part of Plaintiffs' Motion or marked as required by our local

rules.

---

[2] Norma's 2008 bankruptcy schedules show that she owed about $140,000 on her unpaid credit cards at the time
she filed her bankruptcy petition.

Rosalina acknowledged that she did not keep any written records concerning her Oxcell activities, financial or otherwise. (Rosalina's Depo. 46:2–50:19; 53:9-11) Rosalina introduced no evidence of any salary, commission or expense reimbursement agreement or understanding, with Norma or Oxcell, written or oral. Rosalina produced no accounting records, though she testified that she hired an accountant in Tijuana and had received written reports from the accountant she hired. (Rosalina's Depo. 54:23–55:12; 57:11-24) Rosalina could not recall any cash contribution she made to Oxcell. (Rosalina's Depo. 155:20–156:24) Rosalina produced no receipts for cash she vaguely claims that she received from others and gave to Norma. (Rosalina's Depo. 163:6–164:5)

Norma Arellano's deposition was taken on August 13-14, 2007, in a prior, inconclusive Los Angeles Superior Court lawsuit filed by Plaintiffs against Defendants. In this deposition, Norma testified that Oxcell was founded by Norma and Rosalina but that "Rosalina left." Rosalina told Norma she wanted to leave. Norma did not want her to leave, but Rosalina wasn't bringing in any money (Norma's Depo. 28:15–29:21) Though Norma signed a lease and also registered a dba, "Norma's Products," as Rosalina claimed, Norma testified that Rosalina was aware of the dba and that no sales were made under that name. (Norma's Depo. 31:1–32:19) There is no documentary or other persuasive evidence to refute Norma's statements. Norma acknowledged Ramos' investments in Oxcell but attributed all such discussions with Ramos to Rosalina. (Norma's Depo. 38:13–40:8; 40:11-23) Norma reimbursed herself, sometimes $300 or $400 per week. (Norma's Depo. 41:25–42:25) Norma's customers generally paid by check or credit card (Norma's Depo. 47:5-18), and paid in cash less than one percent of the time (Norma's Depo. 61:15–62:5), but all such cash receipts were fully documented. Ramos received in return for his contribution "two leaders" or "recruiting people" (which terms are not clearly explained by the evidence in any relevant or

useful way) who went with Rosalina when she formed Elixery in late 2004 [for purposes of

selling dietary supplements with Ramos]. (Norma's Depo. 68:9-24).

Norma produced invoices for Oxcell's purchases from its suppliers. (Norma's Depo.

74:22–75:2)  There is nothing in the record to show there was any follow up on this subject by

Plaintiffs' counsel McMillan, or otherwise.  Rosalina directed Ramos' work for Oxcell.  (Norma's

Depo. 86:2-23)  Norma and Rosalina took in some money, and Norma reimbursed herself to

some extent.  (Norma's Depo. 88:8–90:24)  Norma explained her Oxcell accounting and stated

that she ended up $91,000 in debt on her credit cards as a result of Oxcell expenses [she paid]

that exceeded Oxcell revenue.  (Norma's Depo.  90:18–97:16; see also, 7:27–8:1, 223:19-25;

251:15-19)  Again, there was no follow up from McMillan, Plaintiffs' counsel, either in the

uncompleted state court litigation or in this adversary, to challenge Norma's exculpatory

evidence as presented in Plaintiff's Motion.

In her state court deposition given on August 14, 2007, Norma discusses the Oxcell

distribution arrangements with Ramos and the fact that he left Oxcell with Rosalina to take his

"people" to Elixery in 2004.  (Norma's Depo. 123:21–128:18)  Norma testified that Rosalina

was "responsible" in the Oxcell operation for Ramos and his work; that Ramos' Oxcell

computer program did not work; and that Ramos was paid all the commissions he earned from

Oxcell.  (Norma's Depo. 136:4–139:21)  There is no evidence that Norma either directed

Ramos' work or promised him any compensation from Oxcell that was not paid to him by

Oxcell in 2003 and 2004.  Norma again acknowledged Ramos' investments made July 1,

2003, and August 7, 2003.  (Norma's Depo. 144:5–152:4)  On August 15, 2007, Norma

promised to produce all further Oxcell documents discussed.  (Norma's Depo. 159:7-14)  Once

again, there is no record of any follow up by McMillan, Plaintiffs' counsel, either in the state

court litigation or here.  Norma states that all sales were documented by invoices, and that

sales totaled about $250,000, less commissions paid and Oxcell expenses paid by Norma via her credit cards.  (Norma's Depo. 167:11–168:21)  Sales tax returns were filed for all Oxcell sales.  (Norma's Depo. 177:10-18)

Purchasers or investors were given a written description of "how the Oxcell program works" (Norma's Depo. 191:7-25), though the written description is not in the record.  Norma explained that investments did not result in any income to an investor unless the investor recruited others [I infer, to sell more product or sign up more product distributors who made sales], but every investor [including Ramos] received Oxcell dietary supplements at the time of his or her investment which they were free to use themselves or sell to others.  (Norma's Depo. 195:3-17)  In effect, it was up to each investor to decide whether to recruit other distributors, sell the products they received to others, or consume the product him or herself.

The evidence filed by Plaintiffs in support of this Motion shows that when Rosalina "left" Oxcell, Norma assumed responsibility for [$91,000 in unreimbursed] debt that she had incurred for the Oxcell venture through the use of her personal credit cards.  (Norma's Depo. 221:11-16; see also, 91:3–92:3; 127:19–128:4; 222:16–224:6; 233:23–234:19).  Norma testified that she incurred such debt on her understanding that Rosalina had promised to pay her share of expenses "once she [Rosalina] sold [her] ranch in Tecate [Mexico]"; in Norma's words, "she will bring herself current," but Rosalina never sold the ranch and never paid her share.  (Norma's Depo. 222:16-24; 90:18-24)  Norma further testified that until Rosalina left, Rosalina was given all Oxcell financial information.  (Norma's Depo. 236:9-15)  Norma outlined in her deposition testimony the many expenses she paid in reliance on Rosalina's promise to reimburse her for the financial contribution Norma made to pay Oxcell expenses.  (Norma's Depo. 22:6-15; 29:20-25; 40:1–42:17; 44:8-21; 80:6-24; 90:18-24; 91:3–92:3; 241:6-11)

Uriel Arellano's state court deposition, taken on August 15, 2007, established clearly that Uriel worked for Norma personally and was paid for his work, but he was not a decision maker or in charge; he simply carried out Norma's instructions.  He also comes across as a candid witness who did not know anything about the purpose, strategy or management of Norma's business, other than as Norma instructed him in his duties, such as making bank deposits and getting cash from the bank as Norma instructed, labeling bottles, and selling products, netting approximately $2,000 per month.  He bought product at $7 per bottle and sold it for $14, paying Norma in advance for all the product he sold and depositing the proceeds of his sales in one of two bank accounts, except as he kept cash for family needs or to give to Norma.  He testified that he had no knowledge of "Norma's Products."

For a period of two years, Uriel purchased the products he sold from supplies that Norma had accumulated during her work with Plenitude, a company that Uriel, Norma, Rosalina and Ramos' mother worked for prior to the Oxcell startup.  Uriel did not start buying "Oxcell" product until about August 2006. (Uriel's Depo. 83:23–85:12)  There were about 93 cases of Plenitude product in his living room when Plenitude went out of business in about June 2001.  (Uriel's Depo. 89:3–90:24)  Uriel worked as an "independent" distributor from the time Plenitude closed down its business in 2001.  (Uriel's Depo. 98:2-5)  His testimony and his activities were straightforward.   There is no evidence to demonstrate that anything Uriel said or did was fraudulent or otherwise improper.

Luis Ramos' state court deposition, taken on November 28, 2007, established that he has a B.S. degree in mechanical engineering from San Diego State University.  He owned a consulting business operated under the name "L.R. Engineering."  He was involved with Oxcell from July 2003 until May 2004.  He met Rosalina through Ramos' mother who worked with Plenitude.

Rosalina solicited Ramos to invest in Oxcell.  Rosalina promised Ramos "an ownership interest in [Oxcell]." (Ramos' Depo. 29:9-24)  "I was supposed to be the cofounder." (Id.)  He attended a meeting "to get people to invest more money" and to "recruit people into the business." (Ramos' Depo. 30:4-19)  He called the program a "chain." (Ramos' Depo 33:13-25)  The evidence is inadequate to explain what he meant by the term.

Ramos invested $27,000 in "business centers" and another $10,000 on his brother's behalf (Ramos' Depo. 32:7-23) between June and August 2003.  (Ramos' Depo. 33:2-2)  Ramos' description of "business centers" (Ramos' Depo. 33:13–35:7) is lengthy but does not establish clearly what the business plan was or how commissions or profits were to be calculated and expenses paid.  (Ramos' Depo. 22:22–23:17; 29:16-24; 32:7–34:24)  His testimony is insufficient to establish a prima facie basis to support his claims for the relief he seeks in this lawsuit.

Ramos acknowledged in his deposition that Rosalina explained the Oxcell system to him and that, while Rosalina drew up a form of agreement that Rosalina signed, Norma never agreed to the terms.  (Ramos' Depo. 40:23–43:6)  Ramos acknowledged that he was disappointed in the deal within three months and he stopped working on the Oxcell project because he did not get the people working with him that he expected.  (Ramos' Depo. 43:7-19)

In the end, Ramos acknowledged in his deposition that he became interested in investing because he knew Rosalina and because she was one of the top distributors in Plenitude.  (Ramos' Depo. 88:17–90:21; 96:1–97:20)  He testified that he was not an employee or officer of Oxcell (Ramos' Depo. 52:23–53:11); that he invested in "business centers" and bought some merchandise from Oxcell (Ramos' Depo. 32:16–34:3); and that he received 1099s in 2003 and 2004, for $5,520 and $500.  (Ramos' Depo. 88:4-13)  Ramos'

testimony is insufficient to establish a <u>prima</u> <u>facie</u> basis to support his claims against

Defendants.

## LEGAL CONCLUSIONS

The transcript of Norma's deposition introduced by Plaintiffs is unclear as to what the

terms of the Oxcell business agreement or plan were.  The evidence as a whole is insufficient

to establish what the financial condition of the business was at the time of Rosalina's and

Ramos' departure and whether the terms were definite and sufficient to form the basis for any

valid, enforceable agreement supportive of Plaintiffs' claims in this adversary proceeding.

Rather, it seems more appropriate to conclude from the evidence, such as it is, that each

Plaintiff had her or his independent and differing view of what the agreement was.  There was

no showing of mutual consent to any common understanding of the purpose or structure of the

enterprise or the terms of any enforceable agreement, even between the Plaintiffs themselves,

as to capital investment, expense sharing, services, employment or compensation, how profit

was to be determined, or who would be responsible for losses.  Moreover, the formative stage

of Oxcell was brief, ambiguously implemented and not completed at the time of Rosalina's and

Ramos' departure from the business.   The corporation, partnership or joint venture, such as it

was, appears to have been abandoned by all parties in early 2004 prior to any agreement as to

the parties' respective rights and responsibilities sufficient to support Plaintiffs' claims.

As for Rosalina's claims of damages, there is no clear allegation or evidence to

establish any enforceable agreement against, or proof of any breach, fraud or intent to injure

by, Norma or Uriel.  As for Ramos' claims of damages, there is no proof of any enforceable

agreement against, or proof of any breach or tort by, Norma or Uriel.  Nothing in the evidence

establishes a <u>prima</u> <u>facie</u> basis to support the Plaintiffs' claims of unaccounted for cash sales.

The Plaintiffs' allegations and evidence consist of conclusory, hearsay, self-serving statements lacking in any convincing support or corroboration.

Plaintiffs' evidence does not refute or adequately explain Norma's testimony (a) that Rosalina left Oxcell in early 2004 without ever paying for her share of expenses, or (b) that neither Rosalina nor Ramos signed successful distributors who produced sales revenue to the company sufficient to reimburse the expenses that Norma paid through the use of her personal credit cards. While Plaintiffs claim that Norma commingled her funds with Oxcell corporate funds, there is no proof of such commingling, either in convincing, unambiguous testimony or in any documentation offered in support of the Motion. Plaintiffs' claims against Norma and Uriel are based on vague, conclusory statements that are not supported by any written evidence or adequate testimonial evidence. Plaintiffs' statutory claims are not supported by persuasive evidence sufficient to establish a prima facie basis for any of the relief sought, let alone the existence of any identifiable, quantifiable, recoverable debt.

The McMillan "declaration" contains little admissible evidence. It is largely argument or a series of conclusory statements unsupported by evidence of any identifiable, enforceable contractual arrangement or enforceable promise. Plaintiffs' claims fail for lack of certainty of an enforceable agreement or an objective basis to identify any understanding sufficiently to establish a prima facie basis for a finding of wrongdoing by either Defendant. Taken as a whole, the evidence is insufficient to support any claim of either Plaintiff.

While McMillan asserts that Defendants refused to cooperate with Plaintiffs' discovery requests, (a) no discovery motion was presented to the court during this adversary proceeding; and though (b) Defendants appeared through an attorney and filed pleadings in this adversary; (c) Defendants obviously appeared, testified and cooperated in their state court depositions previously taken at the Plaintiffs' request, answered questions, produced documents, and

promised ongoing discovery cooperation and to produce further documents for Plaintiffs' follow

up examination.  By contrast, there is no evidence in the record on Plaintiffs' Motion that

Plaintiffs followed up on any of Defendants' promises to cooperate in discovery or sought to

compel further answers or production by either defendant, either as specified in Federal Rule

of Bankruptcy Procedure Rule 7037 or in local rules 7026-1(c) and 7030-1, or otherwise.

Plaintiffs did not file any discovery motion, either in the state court litigation or here.

Pursuant to § 523(a)(2)(A) of the Bankruptcy Code, a debt is nondischargeable to the

extent incurred through false pretenses, false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition.  To prevail on a complaint

to except debt from discharge as one for money, property, services or credit obtained by a

debtor's false pretenses, false representation or actual fraud, Plaintiffs must prove: "(1) a

misrepresentation of fact by a debtor, (2) that the debtor knew at the time to be false, (3) that

the debtor made with the intention of deceiving the creditor, (4) upon which the creditor relied,

and (5) that was the proximate cause of damage to the creditor."  In re Cossu, 410 F.3d 591,

596 (9th Cir. 2005) citing In re Britton, 950 F.2d 602, 604 (9th Cir. 1991).

In the Complaint, Plaintiffs claim that Norma made promises to Rosalina regarding

sharing in profits and ownership in Oxcell; that Rosalina sought investors, traveled to El

Centro, California, designed labels and a web page, traveled to an office in Mexico, and paid

rent for Tijuana office space.  Plaintiffs further claim that Ramos invested money in the

company and performed work on the Oxcell computer system; he invested in "business

centers" which he asserts entitled him to commission payments.  Plaintiffs assert in vague,

conclusory terms that Defendants never intended to provide any benefits to Plaintiffs.

Nevertheless, it is not clear from the evidence what, if any, representations were made by

either Defendant that Plaintiffs justifiably relied on and that demonstrate an intent to deceive.

Even if either Defendant made any representation of fact regarding the profit sharing and ownership of the business, there is no allegation that Defendants knew at the time that any such representation was false.  There is no persuasive evidence of any false promise.  There is no persuasive evidence of damage proximately caused.  In the end, there simply is insufficient evidence to support any 523(a)(2)(A) claim made by Plaintiffs.

Plaintiffs also assert in their Complaint and Motion that Defendants intended to steal Rosalina's customer list that she acquired while working with Plenitude.  Plaintiffs assert that they have suffered injury resulting from loss of their investment capital (including Rosalina's customer list), and as a result of alleged non-reimbursement for expenses and non-payment of compensation owed for work performed.  There is insufficient evidence to establish a prima facie basis to support these allegations.  Such records as there are demonstrate that Rosalina and Ramos were in fact paid for their work and that Rosalina was regularly reimbursed for her business expenses.

A debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny is nondischargeable under § 523(a)(4).  Plaintiffs allege Defendants committed fraud or defalcation while acting in a fiduciary capacity and assert alter ego claims such as commingling of assets as a basis for recovery.  Whether the debtor was a "fiduciary," within the meaning of the "fiduciary capacity" discharge exception, is question of federal law.  In re Hemmeter, 242 F.3d 1186, 1189 (9th Cir. 2000).  The core requirements for a debtor to qualify as a "fiduciary" under the "fiduciary capacity" discharge exception are that the relationship must exhibit characteristics of a traditional trust relationship; the fiduciary duties must have been created before the act of wrongdoing asserted, and not as a result of the act of wrongdoing.  Id. at 1190.

"Fiduciary capacity," as defined by federal law, is narrowly restricted to fiduciary relationships that arise from express or technical trusts.  In re Munton, 352 B.R. 707, 712-713 (9th Cir. BAP 2006).  The broad general definition of a fiduciary relationship, i.e., a relationship of confidence, trust or good faith, is not relevant in the dischargeability context.  Id. at 713, citing Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986).  Though the definition of "fiduciary capacity" is guided by federal law, we look to state law to determine whether the requisite trust relationship exists.  Id.  A debtor will be deemed a fiduciary if state law creates an express or technical trust relationship which imposes trustee status upon the debtor.  Id.  Generally, a trust exists where the statute defines the res, sets forth the fiduciary duties, and imposes a trust prior to, and without reference to, the wrong for which the debt arose.  Id.

In this case, the corporate or partnership aspect of the claims might support a finding of a fiduciary duty on Norma's part, but there is insufficient evidence of a definite corporate or partnership understanding sufficient for enforceability against Defendants.  In addition, the evidence does not adequately support a claim for fraud or defalcation.  Even if there were some plausible claim and sufficient evidence to demonstrate facts to support such a claim, the Plaintiffs do not establish that Defendants committed any offense while acting in any plausible fiduciary capacity arising out of any promise or agreement demonstrated by the evidence. There is insufficient evidence to suggest a prima facie basis to support a finding of fraud, by circumstantial evidence or otherwise.  There is insufficient evidence of any quantifiable, proven act of wrongdoing.  Plaintiffs' claims of damage proximately resulting are vague, uncertain and not supported by sufficient evidence to support a prima facie basis for an award of damages.

A debt is nondischargeable for willful and malicious injury by the debtor to another entity or to the property of another entity under § 523(a)(6).  Under § 523(a)(6), the requirement that injury must be malicious is separate from requirement that it must be willful.  In re Barboza,

545 F.3d 702, 706 (9th Cir. 2008) *citing* Carrillo v. Su (In re Su), 290 F.3d 1140, 1146-47 (9th Cir. 2002). A "willful" injury is a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Id. at 1143, *quoting* Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998) (emphasis in original). A "malicious" injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. Id. *citing* In re Su, 290 F.3d at 1146-47 (*quoting* Petralia v. Jercich (In re Jercich, 238 F.3d 1202, 1209 (9th Cir. 2001)).

Rosalina contributed her Plenitude customer list, invested time developing labels, attending meetings and transporting products. Ramos invested money in "business centers" and time developing a website for Oxcell. Plaintiffs allege they were not compensated for their time and expenses. However, inadequate evidence is cited to support the claim that any such compensation as Plaintiffs now claim was promised or agreed to by Norma or that Ramos was not compensated for his investment or paid for his services. Plaintiffs' evidence is insufficient to support their conclusory claims. Plaintiffs' allegations and claims are self-serving, speculative and insufficient to establish a prima facie basis for a finding that Norma intended to cause injury. Even if Plaintiffs suffered, there is no evidence to support a finding that the conduct of either Defendant was either willful or malicious. In order to prove the element of willfulness, plaintiffs must establish a deliberate or intentional injury. In re Geiger, 523 U.S. at 61. There is no evidence to show that any act of either Defendant was deliberate or intentionally done with an intent to cause injury. Plaintiffs failed to meet the malicious element, as well. It is unclear from the Plaintiffs' evidence whether any act asserted was wrongful, done intentionally, or caused injury without just cause or excuse. The pleadings and the record do not establish the element of maliciousness, as required in In re Su. I conclude rather, that the Oxcell enterprise failed before any agreement necessary to support Plaintiffs' claims was

reached or any such system of reimbursement or compensation as Plaintiffs now claim was established.

Plaintiffs allege that the value of the Defendants' business assets and property is significantly higher than the value they represented in their bankruptcy schedules and that the Defendants made these representations with the intent to hinder or defraud their creditors. These allegations are vague and conclusory.  Plaintiffs' evidence is unconvincing that either Defendant concealed any material asset or business record and does not establish that any representation asserted by Plaintiffs was false.  This is particularly so with respect to Defendants' personal and Oxcell bankruptcies filed in 2008 in relation to Defendants' 2003-2004 assets and conduct.  The evidence does not establish a prima facie case for any false representation or promise fraudulently made.  There is no evidence that any business asset or property scheduled by the Defendants is worth more than what Defendants represented in their schedules or that they concealed any asset material to Plaintiffs' 2003-2004-based claims.

It is curious that Plaintiffs offer unanswered Requests for Admission directed to Norma in 2009 in an attempt to prove, among other things, that Norma "received" Oxcell merchandise between March 2, 2007 and March 1, 2008 and at the same time or later "transferred assets [she controlled] to hinder . . . creditors" and "destroyed accounting records of Oxcell, Inc." These last claims are unavailing in the face of Defendants' cooperation with Plaintiffs' document production requests and, as discussed, Plaintiffs' lack of any follow up.  In short, the record reflects document requests in 2007, Defendants' cooperative answers, and Plaintiffs' silence in response until Requests for Admission served on April 19, 2009.  In my judgment, this record is inadequate to establish the truth of Plaintiff's assertions "by evidence," as required by Federal Rule of Civil Procedure Rule 55(b)(2)(C), particularly with regard to events

and records relating to an inchoate, failed 2003-2004 enterprise that left Defendants holding

the bag at the time of the collapse for $91,000 of debt incurred.  See Wells Fargo Bank v.

Beltran (In re Beltran), 182 B.R. 820, 823-24 (9th Cir. BAP 1995); AT & T Universal Card

Services Corp. v. Sziel (In re Sziel), 206 B.R. 490, 493 (Bankr. N.D. Ill.  1997); Lu v. Liu (In re

Liu), 282 B.R. 904, 912 (Bankr. C.D. Cal. 2002).

Plaintiffs argue that Uriel and Norma are not individuals within the meaning of §

727(a)(1), but the manifested alter ego of Oxcell, Inc.  Plaintiffs alleged that Norma

commingled funds, treated assets of the corporation as her own, used the corporation as a

shell for another corporation, concealed and misrepresented the identity of the responsible

ownership, used the corporate entity to produce labor and services for another entity,

disregarded legal formalities, failed to maintain an arm's length relationship among related

entities, and used the corporation to transfer existing liability of another person or entity.  While

sounding ominous, every allegation is conclusory.  No such allegation is supported by

sufficient evidence to support a finding in favor or Plaintiffs on a prima facie basis.  There is no

evidence that shows Defendants and Oxcell (or Divina Life) are the same entity or that it would

be appropriate to pierce any corporate veil.  The evidence adduced is vague, unspecific,

undocumented and uncorroborated.  While the allegations are primarily conclusory, the

evidence, such as it is, is simply unconvincing of the allegations made.

Section 727(a)(2)(A) states:

The court shall grant the debtor a discharge unless –

(2) the debtor, with the intent to hinder, delay, or defraud creditor or an officer of the
estate charged with custody of property under this title, has transferred, removed,
destroyed, mutilated, or concealed, or has permitted to be transferred, removed,
destroyed, mutilated, or concealed—

(A) property of the estate, within one year before the date of filing of the petition.

The party seeking denial of discharge under § 727(a)(2)(A) must prove, even on a motion for default judgment, and at the every least, a plausible <u>prima</u> <u>facie</u> basis to demonstrate (1) a disposition of property, such as by transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of property.  <u>In re Hansen</u>, 368 B.R. 868, 876 (9th Cir. BAP Cal. 2007);  <u>In re Lawson</u>, 122 F.3d 1237, 1240 (9th Cir. 1987).  Plaintiffs' evidence fails to meet that test.

Plaintiffs allege that Defendants concealed Oxcell property.  The evidence is unclear what property Defendants are accused of concealing.  There is no evidence to show improper concealment or transfer of any property material to Plaintiffs' 2003-2004-based claims.  There is no evidence that Defendants had a subjective intent to hinder, delay or defraud anyone through any act of disposing any property.

Section 727(a)(4)(A) states:

The court shall grant the debtor a discharge, unless –

(4) the debtor knowingly and fraudulently, in or in connection with the case,

(A) made a false oath or account.

To deny a debtor a discharge under § 727(a)(4)(A), a plaintiff must show that (1) the debtor knowingly and fraudulently made a false oath; and (2) the false oath related to a material fact.  <u>In re Wills</u>, 243 B.R. 58, 62 (9th Cir. BAP 1999).  A false oath may involve a false statement or omission in the debtor's schedules.  <u>Id</u>.  Materiality is broadly defined.  <u>Id</u>.  A false statement is material if it bears a relationship to a debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.  <u>Id</u>.  The plaintiff must show that the debtor knowingly and fraudulently made a false oath.  <u>Id</u>. at 64.  Intent must be actual, not constructive.  <u>Id</u>.

Plaintiffs allege Defendants did not disclose in their schedules product inventory held by them and purchased with their credit cards they listed in their schedules.  It is unclear either from the Plaintiffs' allegations or their evidence what product inventory Defendants should have disclosed or which 2008 bankruptcy schedules were false (the Defendants' personal bankruptcy or the Oxcell bankruptcy).  Plaintiffs' assertions about 2003-2004 assets and conduct are unconvincing.  The evidence adduced by Plaintiffs is insufficient to support a conclusion of a 727(a)(4)(A) violation in 2008 by either Defendant.

Plaintiffs allege that Defendants did not adequately disclose the facts about Divina Life; however, omissions or misstatements concerning property that would not be property of the estate do not meet the materiality requirement of § 727(a)(4)(A).  Id. at 63.  An omission or misstatement relating to an asset that is of little value or that would not be property of the estate is material only if it is also demonstrated that the omission or misstatement detrimentally affects administration of a relevant bankruptcy estate.  Id.  There is no such showing in Plaintiffs' evidence.

By Plaintiffs' own admission, Divina Life is registered solely under the name of Anjelica Arellano, Defendants' daughter.  All that appears from the Defendants' schedules is that Norma Arellano was employed by Divina Life in 2008.  Other evidence establishes that Divina Life was formed in 2008.  There is no evidence to link the activities of a corporation formed in 2008 with Defendants' Oxcell activities in 2003-2004 or with any other allegation or material evidence offered in Plaintiffs' Motion.

In addition, Plaintiffs allege that Defendants made false statements in their bankruptcy papers and in the Oxcell bankruptcy case (LA 08-11039 RN) regarding the ownership and value of the corporation.  However, the allegations and evidence are insufficient to establish a prima facie basis to support Plaintiffs' claims under § 727(a)(4)(A).

The evidence does not support the claims that Divina Life should actually be treated as property of Defendants' estate or that Defendants' failure to disclose this entity detrimentally affects administration of Defendants' bankruptcy estate.  In addition, Plaintiffs have failed to establish by their evidence any fraud or omission knowingly made.  There is no evidence sufficient to support a claim under §727(a)(4)(A).

Sections 727(a)(4)(B) and (a)(4)(D) provide:

The court shall grant the debtor a discharge, unless –

(4) the debtor knowingly and fraudulently, in or in connection with the case,
. . .

(B) presented or used a false claim. [or]
. . .

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

Plaintiffs argue that the value of Defendants' business assets and property is significantly higher than the value they represented and that Defendants' represented such assets falsely with the intent to hinder or defraud creditors.  Plaintiffs' evidence, circumstantial or otherwise, does not establish any basis for concluding that Defendants made any representation that was false or that any scheduled information was false.  There is no evidence to establish a prima facie basis for a finding to support the claim that such assets, if any, have any value material to or affecting the administration of Defendants' bankruptcy cases.

Plaintiffs assert that inventory, cash and other assets were not disclosed in either the Oxcell bankruptcy schedules or in the Arellano's personal bankruptcy schedules.  First, if Oxcell failed to list required assets, Plaintiffs should have asserted that claim in the Oxcell case but did not do so.  Second, there is no persuasive, definite or useful evidence of any

inventory, cash or other asset that Defendants should have disclosed but did not in either

bankruptcy case.

### CONCLUSION

Given the magnitude and breadth of Plaintiffs' claims, the best the court can discern is

that Plaintiffs surmise that there were important contractual arrangements between the parties.

Plaintiffs' Oxcell goals were not achieved.  Plaintiffs were disappointed and claim to have

suffered damages.  The evidence, however, does not add up to the quantum required for a

finding of wrongdoing or debt, or a basis for nondischargeability or denial of discharge, the

relief sought by Plaintiffs.  The allegations and the evidence are insufficient to support any

claim asserted.

In the end, the record in this adversary and in Defendants' bankruptcy reflects

schedules showing modest assets, heavy credit card debt, a financially underwater family

home, lost to foreclosure in 2009, apparently due to debtors' modest income.  "No asset"

reports were filed by the trustees in Defendants' bankruptcy and in the Oxcell bankruptcy

within a few weeks of commencement of each case.

It appears that everybody lost.

A separate judgment will be entered dismissing the Plaintiffs' claims and granting

Defendants a discharge.


DATED: March 26, 2010

_____
United States Bankruptcy Judge

**NOTE TO USERS OF THIS FORM**:

1)  Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
2)  The title of the judgment or order and all service information must be filled in by the party lodging the order.
3)  **Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
4)  **Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief.  <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*)  <u>MEMORANDUM DECISION</u>
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of <u>3/2/10</u>, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

Howard M Ehrenberg
ehrenbergtrustee@sulmeyerlaw.com, ca25@ecfcbis.com

Brian Dobrin on behalf of Debtors
BrianDobrin@aol.com

Scott A McMillan on behalf of Plaintiffs
scott4670@gmail.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

Debtors/Defendants
Norma and Uriel Arellano
1932 E. 74th St.
Los Angeles, CA 90001

☐ Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page